# Case No. 12,857.

## The SILVER SPRAY.

[1 Brown, Adm. 349.] [1]

District Court, E. D. Michigan. Feb., 1872.

SALVAGE — UNDER CONTRACT — LIMITATION — AMOUNT AGREED ON—SUBSALVORS.

1. Services rendered in pulling boilers out of a navigable river, into which they had fallen from a steamboat, are salvage services.

2. An agreement for a specific sum dependent upon success does not alter the nature of the service as a salvage service, but only furnishes a rule of compensation.

[Cited in The Marquette, Case No. 9,101.]

3. Such an agreement will not be set aside and a commensurate salvage awarded because it proves to be a hard one for the salvor.

4. A person hired by the salvor to assist him, with knowledge that his employer is operating under a contract, is also limited in the amount of his recovery by the contract price, and the fact that he is misinformed as to the terms of the contract creates no additional liability on the part of the property or its owners.

[See Baker v. The Tros, Case No. 783.]

On the libel of David Beard and Robert McArthur, for salvage. The libel alleged the loss of the boilers from the wreck of the Silver Spray, in Lake Huron, while the wreck was being raised (the vessel having been sunk by a collision), the abandonment of the boilers by the owners and insurers, and the raising and saving of the same by the libellants; that the value of the boilers was $2,000; and that the value of the libellants' labor, time,

---

[2] [From 11 Int. Rev. Rec. 118.]

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

skill, expenses and use of machinery and teams were, in all, $1,825, for which they claim a lien on the boilers. The answer of John H. Moore admitted the boilers dropped into the water from the wreck while being raised, substantially as alleged in the libel, except that it happened in St. Clair river instead of Lake Huron, but denied that the same were lost or abandoned, as alleged; admitted that libellant McArthur raised the boilers and put them on shore, and at some trouble and expense, but not to the value and amount alleged, and denied that the boilers were worth $2,000; alleged that the boilers were so raised by express agreement with said McArthur to do the same for $100, and a tender of that sum before the libel was filed.

On the facts, which will appear in the opinion of the court so far as necessary, it was contended on the part of the respondent: (1) That there was a contract with the libellant McArthur to raise the boilers and put them on shore for $100, and no more. (2) That there being such contract the claim was not a salvage claim, and that, therefore, the libel must be dismissed. (3) That if a salvage claim, notwithstanding the contract, then the decree must be for the $100, and no more. (4) That there having been a tender after suit brought, costs could be awarded only up to the time of such tender.

On the part of libellants it was conceded that there was a contract with McArthur, but it was contended: (1) That such contract was for "$100 and salvage." (2) That if the contract was as contended by respondent, for $100 and no more, then the amount being so grossly inadequate to the amount of labor, skill, and money actually expended, the court would disregard the contract and award a proper sum as salvage. (3) That the libellant, Beard, not being a party to the contract, was entitled to salvage without reference to it.

John Atkinson, for libelant.
W. A. Moore for claimant.

LONGYEAR, District Judge. It being conceded that there was a contract, the point to be determined is what was the compensation agreed on, that being the only point in dispute in this regard. The bargain, whatever it was, was made before anything had been done toward raising the boilers. Moore, the claimant, testifies that the bargain was for $100 for all services and expenses in raising the boilers and putting them on shore. McArthur testifies that it was for $100 "and salvage"—that the $100 was for finding the boilers, and that for raising them and putting them on shore he was to have a fair salvage compensation. McArthur's son testifies that he was present during a portion of the .conversation, that he heard his father say he must have salvage, that he heard something said about $100, but did not understand what

it was for. A Mr. Reilly, who had been acting for Moore in the matter, was also present, and he testified that he heard nothing said about salvage in addition to the $100, but he understood that amount to be in full for all services and expenses in raising the boilers, but as he was quite hard of hearing his testimony is not entitled to very much weight as to verbal statements, although he is an intelligent and a credible witness as to all facts within his knowledge.

The statements of Moore and McArthur are positive and in direct conflict, and that too in regard to a matter of fact in regard to which there should be no dispute between them. This being the case, the surrounding circumstances become of great importance. The boilers dropped from the wreck, and filled and went to the bottom very near where they dropped. This was of course in presence of persons in charge of the wreck, and being in a narrow river and in only about 20 feet of water, the finding of them by those interested could be no very difficult task. McArthur testifies that he discovered them accidentally while crossing the river in a skiff. Moore testifies positively that he knew where they were before he learned it from McArthur, and that, although the owners had abandoned the wreck to the insurers, the insurers, for whom he was acting, had not abandoned the boilers, but were intending to recover them, and in these statements Moore is in no manner contradicted. Is it probable that McArthur would claim, or Moore agree to pay, $100 for information which thus accidentally fell in the way of the former, without any expenditure of labor, skill, or money, and which was already in possession of the latter, or which was at all events of so easy access? I think not. This is rendered still more improbable, and the true nature of the agreement becomes still more apparent, when we consider what transpired before Moore and McArthur met. It appears that Reilly, who lived near where the boilers were, and knew McArthur, wrote to Moore, who lived in Buffalo, recommending McArthur as a proper person to employ to get the boilers out. Moore, in reply, wrote to Reilly, under date of May 19, 1870, as follows: "I am informed it will not cost over $30 to drag the boilers on shore. Simply throw chains or ropes around them, and put a snatch-block, with a horse, and drag them ashore in half a day. But if your man will take them on shore, up on the bank of course away from the water, I will give him $100. * * * Please write me what the man says, or let him do it." Reilly testifies that, after he received Moore's letter, he had an interview with McArthur, and read the letter to him, which is also admitted by McArthur in his testimony. Reilly further testifies that, immediately after this interview, he wrote to Moore, which letter, under date of May 23, 1870, was put in evidence, and as the statements in it correspond with Reilly's testimony, and are entitled to some additional

weight because they were made while the facts were fresh in the writer's memory, I quote from it. Reilly, in this letter, says: "I have seen and read your letter to McArthur. He will go to work in a few days and see what he can do. The weather does not permit just yet. I think that there will be a little more difficulty than you think about drawing the boilers on shore, on the ground that there is a steep bank which they have to be dragged over, and that bank is a bank of sand. However, I told him that no matter how much work he done that he would get nothing for it unless that he took the boilers clear away from the water." Reilly further testifies that in his negotiations with McArthur the latter set up no claim, nor even mentioned any claim, for finding the property, nor for salvage, in addition to or otherwise than at the price proposed by Moore in his letter, but, on the contrary, what took place between them, and the result of it, is substantially set forth in his (Reilly's) letter to Moore. It was in this state of the case, and under these circumstances, that Moore and McArthur met, some four or five days after the interview between Reilly and McArthur, and the bargain was concluded. These circumstances strongly corroborate Moore's statement that nothing was said about salvage in addition to, or otherwise than the $100, and my mind is led irresistibly to the conclusion that the contract was that the $100 was to be in full for all services, time, labor, skill and expense in getting the boilers out and putting them on shore, and that such was the clear understanding of its terms by both parties at the time.

Another consideration adds much strength to this conclusion. If the contract was for $100 and salvage, as now claimed by libellants, why did they not set it up in their libel as the basis of their claim? That they did not do so, but set up a claim for salvage merely, is a circumstance of great weight, tending to show that at that time they had no such understanding, and that the claim now set up is an after-thought. The theory of the libellants in filing their libel undoubtedly was the same which the court is now asked to adopt, viz.: That the contract, having turned out in the event to be a hard one for the libellants, it would be disregarded, and salvage proper be awarded. I find, therefore, that the service was rendered under a specific contract with McArthur, to be paid $100, in case of success, in full for all labor, time, skill and money, expended in the premises. Beard's relation to the matter will be noticed hereafter.

The second point made by respondent's advocate was not insisted on, and indeed it is well settled in England and in this country that an agreement for a specific compensation does not alter the nature of the service as a salvage service, but only furnishes the rule of compensation; especially where, as in this case, the right to receive the compensation agreed on was made dependent upon success. 2 Pars. Shipp. & Adm. 309, notes 1, 2; The William Lushington, 7 Notes Cas. 361; The Catharine, 6 Notes Cas. Supp. xliii., li. (where the question is quite fully discussed); The A. D. Patchin [Case No. 87]; The Emulous [Id. 4,480]; The Whitaker [Id. 17,524, Id. 17,525]; The Independence [Id. 7,014]; Williams v. The Jenny Lind [Id. 17,723]. That the nature of the service was a salvage service, I think, admits of no doubt, even though the property saved may not have been derelict. 2 Pars. Shipp. & Adm. 291. It was maritime property, and it lay sunken in maritime waters. In The Emulous [supra], Judge Story says: "I take it to be very clear, that wherever the service has been rendered in saving property from the sea, or wrecked on the coast of the sea, the service is, in the sense of the maritime law, a salvage service" (see also cases cited supra).

The third point made by the respondent, and the second point made by libellants, will be considered together. On the part of the respondent it is contended that the compensation must be limited to the contract price, and, on the part of the libellants, the court is asked to disregard the contract, and award them a sum as salvage somewhat commensurate to their expenditures. As the matter turned out, it was no doubt a hard bargain for the libellants. But I do not understand that a court of admiralty will set aside a contract for that cause alone, where it is free from all fraud, deception, mistake, or circumstances of controlling necessity. McArthur had ample time for consideration, and there is no pretense of any fraud or deception on the part of Moore or his agent Reilly, or that McArthur did not know all about the situation, and the difficulties in the way of getting the boilers out, and there was no controlling necessity, of duty or otherwise, to undertake the job. The contract appears to have been entered into openly and fairly in all respects, and there is no principle or authority upon which the court can disregard it, or make a new contract for the parties. It must, therefore, be enforced as it stands. See 2 Pars. Shipp. & Adm. 307, notes 2–5; The True Blue, 2 W. Rob. Adm. 176, 180 (a case very much like the present, except that in that case the expense was largely increased by a storm having come on, and yet the contract was enforced although the disparity was great); also The Henry, 2 Eng. Law & Eq. 564; The Phantom, L. R. 1 Adm. & Ecc. 59; The Salacia, 2 Hagg. Adm. 262; The A. D. Patchin [supra]; The Whitaker [supra],—a case very much like the present; Bearse v. 340 Pigs of Copper [Case No. 1,193]. McArthur was under no obligation to continue the work after he saw it must be a losing operation. His compensation was dependent upon success, and he was at liberty to abandon the work at any time. Parties, after having entered into a deliberate and explicit agreement, must not be encouraged to make large ex-

penditures beyond the contract price at the expense of the owners, by the courts, loosely or without the most cogent reasons, disregarding contracts thus entered into, and free from all circumstances of fraud, deception, mistake, or oppression existing at the time the contract was made. Parties must understand that contracts fairly entered into will be strictly enforced in admiralty, as well as elsewhere.

But it is contended that the libellant Beard, not being a party to the contract, is entitled to salvage, without reference to the contract. I do not think this position can be maintained. Beard was hired by McArthur, and was informed by the latter that he was operating under a contract. If McArthur misinformed him as to the terms of the contract, that is a matter between them, and such misinformation cannot operate to create any additional liability on the part of the property or its owners. McArthur was not, by virtue of his employment, an agent of the owners to create any liability beyond that for which he had contracted. The case of The Whitaker (cited supra) was very much like the present case, except in that case the original contractor Holbrook gave up the job entirely to Otis, who undertook and performed it. The court refused to decree in favor of Otis, without Holbrook being first made a party libellant with him; and then, although Otis had expended between $2,000 and $3,000 in that service, the court limited them to the contract price, which was only $900. Beard's compensation, like McArthur's was dependent upon success. He, therefore, stands in as good position as McArthur as to lien, but no better as to amount.

As suit was brought immediately after the service was completed, and without any demand or refusal to pay, no interest can be allowed. The tender was made September 10, 1870, which was after this suit was commenced. Costs must, therefore, be allowed up to, but not after that date. As the money tendered was not brought into court, a decree must be passed in favor of libellants.

Let a decree be entered in favor of libellants for $100, and costs up to September 10, 1870. Decree for libellants.

See The Marquette [Case No. 9,101].